The next and final case we're arguing today is 22-1705 N. Ray Adams. Dr. Pate, are you ready? Yes. Good morning, and may it please the Court, I'm Jack Pate, representing Philip M. Adams, who's the inventor named in patent application serial number 15412696. I'm not here to regurgitate the entire briefing, thousands of pages of record, Can I ask you to speak a little louder? Oh, by all means, sir. Usually my voice is a lot better than it is today. We'd like to just point to a few errors that we believe are actually dispositive of the case, and if properly decided, would dispense with any analysis of a lot of the remaining issues. And some of those are the definition of the independent data streams, the idea of data integrity, or the definition of it, also the intrinsic record and how it should control the case. So, now I will also mention, we have no beef with the standard of review that's stated by the opposing side, but it does leave a gap. They talk about the specification, they talk about the case they cite says the substantial evidence standard is for extrinsic evidence of facts that the Court hasn't ruled on. There's no extrinsic evidence in this case. In fact, that's a point of contention. But, so, as far as understanding the case today, there are a number of legal errors in the process by the examiner and by the Board in terms of interpreting the claims properly. One of the principal points that is made repeatedly from the beginning, from the examiner during the prosecution all the way to the... In the red brief... Pardon? In the red brief, your opposing counsel says that you've raised new arguments about the recited claim terms maintain integrity and identifying binary segments common to the first and second process samples and says that those are forfeited as are the new arguments attacking the examiner's rationale behind the motivation to combine the reference. So, my question is, where in the record below did you raise the arguments related to the recited claim terms maintain integrity and identifying binary segments common to the first and second process samples? Okay. We argue those to the examiner from the beginning. And if you look back at the examiner's answer and our reply, we have the right to reply to the examiner. In the NCEP site we provided you, we have the right to reply to the examiner. He raised a rash of issues in his answer, and we replied to those. And so, you'll find that in our reply brief in this case, before this tribunal, we identified all the places. I mean, we had 11 different citations we made to the examiner's answer showing that we were responding to his issue. Right. But I guess when it comes to identifying all the possible defects in an examiner's final rejection, it's incumbent upon you in your appeal brief to the board to not only identify those possible defects, but then to explain why those defects are, in fact, errors by the examiner. And the PTO's regulations are pretty clear. You know, the board cited one of them, 41.37C14 and 41.41, 41.52, that are pretty clear that you're not allowed to raise a new issue, a new possible error by the examiner's rejection in your reply brief. You are correct. You are allowed to reply to arguments and statements made in the examiner's answer, but you're not allowed to raise brand new arguments attacking the rejection in your reply brief. Okay. I guess I don't, as I reviewed that record, I did not see where we were raising a new issue really in doing that. We're simply pointing out. Well, what about the data integrity argument and then the binary segment arguments? As I understand your appeal brief to the board, those particular arguments about alleged defects in the examiner's final rejection are not contained in your appeal brief. Is that right? They were perhaps raised in your reply brief, but not in your initial. I'm sorry. Go ahead. Your appeal brief to the board, your board opening brief, did it raise these two arguments about data integrity and binary segments? My memory of them is absolutely they were issued in the beginning, because that's the whole problem with the claim interpretation is that we went into the claim itself and we repeatedly said, you're not reading the claim right. What you're doing is you are ignoring the definitions of those terms, those exact terms, and those were all raised. You're ignoring those definitions that are found in not only. Well, they're explained in the context of the spec, but there's also the intrinsic record, which is supposed to be considered along with the specifications binding on the inventor. And so they talk about the declaration of the inventor. Well, yeah, there are 24 paragraphs laying out his his qualifications to say what he's saying, which is largely a tutorial of facts to the examiner who is ignoring all the terms of art in the art. So what happened was the examiner kept misinterpreting improperly and grammatically that those will not stand. And so we have we've argued from the beginning that the prior art doesn't have a quote data stream the way that is intended to be met here. The data stream has to be have no knowledge of formats and all that. In other words, it's a low layer ones and zeros. No matter what the data represents, our system just treats it as ones and zeros. No format, no, no administrative, no instructional, no, no headers, none of that can be recognized. And so they don't even have a data stream. But the main problem they run into and we have argued there was if you look at the claim itself, claim 20, which is found, I guess, in every brief right at the beginning, the claim, OK, talks about a system of at least one processor. The PTO keeps ignoring the continuing limitations and they just each each thing to to almost one word. For example, the claim in the third paragraph of the claim, a second data stream processor programmed to receive the data of a second data stream, comma, independent from the first data stream, comma. The opposing side has argued ever since the original prosecution and all the way through the briefing that the independence is independent receipt over independent buses. No, there is a place in the claim where we talk about receiving information over two buses. But this independent from the first day is independent is an adjective. It's in an adjective clause or a positive adjective clause following the term data stream. And it's set off by comments. If it were if it were instead describing or further defining the receipt or the receive, then it would have to be an adverb modifying receiving. OK, and it's not. And so then it would have to be receiving independently. I suppose you could amend these claims if you wanted to. Right. You can file a continuation. Well, we have we actually filed a divisional off of this. Oh, so you have a pending division. We have a pending division. Did you do the amendment that makes it extra clear that the two data streams have to come from two separate sources? Well, that's a different limitation. We said independent sources. And the reason we use the word independent now, I mean, I understand why you use the term independent and what your interpretation of the word independent is. Obviously, the board had a different interpretation of that. What I'm asking you is, did you in your divisional amend your claims in such a way that not only do we have to rely on an interpretation of the word independent, but you actually express these right into the claim? What is going on here is comparing one data stream from one source and to a second data stream from a completely different second source. Is that written in your pending claims in your division? I do not recall whether we made that change. We did make some amendments. We did make some amendments in view of this case, but there's no need for us to do that because proper, claim interpretation in this context has to consider the entire intrinsic evidence. The case, the case, which cites back to cites back to Markman, those kinds of cases. The improper claim interpretation arises out of the fact that they basically and this shows throughout the record, shows in the statement of substance of interview, shows in the argument where he doesn't he not only does not give the Adams declaration any substantial weight, he gives it no weight. He says so. He says so to my face. It's documented in here. He said it in his briefing. It's documented in here. And so that's the improper and that's the problem here is that they did not give any weight to that declaration. And that declaration is merely a set of explanations. And it's binding on the examiner. And the file history must be used to interpret the claim. So that's legal error. And we want that reversed. OK, we're into rebuttal time. Pardon? You're into your rebuttal. Oh, I'm sorry. I didn't realize. All right. Good morning, Your Honor. May please quit. The only issue that appellant preserved for this court on appeal is the independent issue. Every every other issue is either a part of that main issue or it has been forfeited. As you discussed with the appellant, I'm going to ask you to speak a little more loudly to it. I've got my hearing aids. Do you want me to repeat that? No, I heard you. At every step since the opening brief at the board, appellant has either added or shifted arguments. It added arguments in the reply brief and the request for a hearing so that the examiner didn't have a chance to respond. And it added arguments at the brief stage, which the board didn't have a chance to respond to. And it added more arguments in the great brief that the director didn't have a chance to respond to. The moving on to the claim term independent. The board's interpretation of the claim term independent is fully supported by the record, including the claim language itself, which does not recite any data sources whatsoever. Appellant's citation to the places in the specification that talks about one or more sources includes one source as well as more than one source. And the named inventors declaration doesn't even go so far as to say that the claim requires streams originating at different sources. What Dr. Adams' testimony said was that independence between two data streams should be given its common ordinary meaning and that it means that no relationship is known between the two data streams. That does not support an interpretation of the claims that requires two data streams from two different originating sources. Let me ask you three questions, but they're all the same, more or less. That is, is a declaration made by an inventor during patent prosecution intrinsic or extrinsic? And does the record indicate whether the board treated the Adams declaration as intrinsic or extrinsic? And three, does it make a difference whether it's one or the other? Well, if I may answer the third question first. No, I don't think it matters because the board and the examiner said in the record that they considered the declaration. Yes, they did. And I don't think they said one way or the other whether it's intrinsic or not. And I guess it could be considered intrinsic because it's in the file, but it is the inventor's declaration. So maybe it should not be given as much weight as, say, the claims in the specification. Does that answer your question? My domain. Does the court have any further questions? What would you itemize as the actual arguments that were preserved in the appeal brief to the board? One is the argument about what does independent mean. What else was in the appeal brief? In the appeal brief, there was some discussion about what translating means, which I don't think was super clear and maybe had something to do with the comparator. So the appeal brief did talk about the comparator claim term, but it was relevant to whether the streams were independent or not. So Appellant argued in the opening brief that Yost does not teach a comparator because it doesn't compare different streams originating from different sources. And the third and I think the last issue that was preserved in the opening brief at the board was whether or not the examiner gave the proper weight to the declarations and nothing else. Nothing in there about data integrity? No data integrity and no binary data streams arguments. Thank you. Thank you. You've got some rebubble time, sir. Pardon? You've got some rebubble time. Okay. Basically, the idea of did not give it the weight, we said, no, it's absolutely part of the intrinsic record and it's supposed to be given the same weight. It's supposed to be given the same weight as the specification as the definitions and they're all there. And by the way, this idea of the comparator, the comparator was argued right and left. The declaration actually admits that virtually every computer system has a comparator. The whole point of the comparator argument was this data stream and its characteristics. Now, in the last brief, we call it protocol and protocol and format agnostic. Okay. That's not a term we use, but we did argue right from the beginning and all the way through all the briefing that our system cannot regard anything by way of formatting. It is dealing with ones and zeros no matter what the data is because it's only looking for matching patterns. Okay. Every other system. Okay. Not one of them had independent data streams. They did not have the data integrity. They were all checks on an identical data stream. So when we say independent data stream, the word has its ordinary meaning. He does define it. There's no known relationship between them. We use the word independent in the specification with regard to something else. It's the same ordinary meaning. And they say there's no support for that. Excuse me. We referred to federal standard 1037C right at the get-go after the 24 paragraphs of qualifications. We went to and said we're going to rely on the ordinary meanings of these terms. For example, federal standard 1037C. And you can go to federal and, by the way, you go to that and it says this is for the use in telecommunications and computer of every federal agency. And we put that as our support. And then we went into a bunch of ordinary meanings. Okay. You can go look those things up in the federal standard 1037C. So they keep saying we have no support for that declaration. First, we don't need any. This is 24 paragraphs with three doctorates and consulting with everybody from IBM to the KGB and teaching at worldwide universities where he is right now. All of that was adequate and is in the record. He bound himself to it. And we're entitled to that. And they had to consider that. It's not an option or more weight or less weight. No, that's the whole context behind the interpretation of the claim. Is the PTO bound by any inventor statement about what? Pardon? Is the PTO bound by any statement made by the inventor during the prosecution as to the meaning of the claim? We're bound, but it's the PTO bound. Well, if the PTO says, well, this inventor is telling me the sky is orange, but I don't think the sky is orange. And so I'm not going to read that into the claim. I mean, would that be something wrong for the PTO to do? If the inventor binds himself to a definition of a term, then they are bound to that because that's part of the record. He's bound to it and the PTO is bound to it. There's the case law that inventors subjective view as the scope of this claim is something that the agency is bound by. No, no. And has to then incorporate that preferred interpretation, even though the words might not line up and actually say what the inventor wants. OK. I didn't. Where's that? I may have missed. I may have misstated. I don't mean that the PTO is bound to it. What I'm saying is the examiner is obligated to consider that as the same as if it's in the spec. OK. When the examiner makes a statement, that is part of the historical record. And he has to consider that when he's interpreting the claim. And the basic reason for reversal here is that they committed legal error in their claim interpretation for data streams, independence of data streams, and in terms of data integrity throughout from the very beginning. And it's replete throughout the record. Thank you. And that concludes our cases today. Thank you. Thank you.